IN THE UNITED STATES DISTICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. CARL PATTERSON, as Special Administrator of the Estate of Dustin James Patterson, deceased,<br><br>    Plaintiff,<br><br>  v.<br><br>1. CORECIVIC, INC., a foreign for-profit business corporation;<br>2. JOSEPH NORWOOD, in his individual capacity as Warden of Davis Correctional Facility;<br>3. CONNOR WHITLOCK,<br>4. ROBERT CHOATE,<br>5. STEVEN ELLER<br><br>    Defendants, | Case No: CIV-24-52-DES<br><br><br>ATTORNEY LIEN CLAIMED<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW the Plaintiff, Carl Patterson ("Plaintiff"), as Special Administrator of the Estate of Dustin James Patterson, deceased, by and through his attorneys of record, and for his causes of action against the Defendants, alleges and states as follows:

## INTRODUCTORY STATEMENT

1. In the early morning hours of September 2, 2022, Dustin James Patterson ("Dustin") was brutally strangled to death by his cellmate, Darren Padron ("Padron"), at Davis Correctional Facility ("DCF" or "Prison"), the notoriously dangerous and chronically understaffed private prison operated by CoreCivic.

2.    In the hour preceding Dustin's murder, Padron held Dustin tightly around his neck, while more than ten (10) DCF employees watched from the window of the cell. Dustin cried out for help to Prison staff as Padron, who was unarmed, slowly choked the life from him.

3.    Unfathomably, Prison staff did not enter the cell or intervene in the attack until Padron had killed Dustin. Dustin's death was eminently preventable. Prison staff had every opportunity to stop the attack and save Dustin's life. Instead, Prison staff watched for **over forty-five minutes** as Padron slowly and deliberately strangled Dustin to death.

4.    CoreCivic is the nation's most notorious private prison operator and Dustin's death is indicative of the profound and serious systemic failures within CoreCivic's corporate structure. To maintain its profit margin CoreCivic serially underinvests in prison staff, security, and inmate healthcare at its prisons, leaving inmates such as Dustin exposed to serious risks of violence.

5.    CoreCivic had known for years of the extreme and preventable violence its profit-motivated policies and practices created for inmates at DCF. In the first nine (9) months of 2022 alone, at least eighteen inmates/staff members were stabbed - three of which were fatal.[1] One of the deaths included the gruesome murder of DCF detention officer Alan Hershberger.

6.    Despite being aware of the abhorrent conditions at DCF, CoreCivic did nothing to ensure that Dustin was provided any semblance of protection while housed at DCF.

### JURISDICTION AND VENUE

7.    Paragraphs 1-6 are incorporated herein by reference.

8.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and Fourteenth

---

[1]    *See*, Ashlyn Huffman, *Stabbings Soar at Southeast Oklahoma Private Prison*, https://oklahomawatch.org/2022/09/16/stabbings-soar-at-southeast-oklahoma-private-prison/.

Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

9.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth Amendment and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District

## PARTIES

11.     Paragraphs 1 through 10 are incorporated herein by reference.

12.     Plaintiff, Carl Patterson ("Plaintiff"), is a citizen of Oklahoma and the duly-appointed Special Administrator of the Estate of Dustin Patterson. The survival causes of action in this matter are based on violations of Dustin's rights under the Eighth Amendment and the Oklahoma Constitution.

13.     CoreCivic, Inc. ("CoreCivic" or "Defendant") is a foreign, for-profit business corporation that conducted business in Hughes County. CoreCivic is a private corrections company that contracted with the Oklahoma Department of Corrections ("DOC"), during the pertinent timeframe, to operate private prisons. CoreCivic was at all times relevant hereto responsible, in part, for providing care and supervision to Dustin while he was in the custody of the DOC at Davis Correctional Facility ("DCF" or "Prison") in the town of Holdenville, Hughes County, OK.[2]

---

[2]    CoreCivic ceased operating DCF on October 1, 2023 when the DOC did not extend its contract with CoreCivic and took over operations of the Prison.  *See*, Keaton Ross, *Oklahoma closer to eliminating private prisons with takeover of Davis facility*, Oklahoma Watch, https://oklahomawatch.org/2023/08/31/oklahoma-inches-closer-to-eliminating-private-prisons/.

CoreCivic was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the housing and supervision of inmates at the Prison, and for training and supervising its employees. CoreCivic was, at all times relevant hereto, endowed by Hughes County and the state of Oklahoma with powers or functions governmental in nature, such that CoreCivic became an agency or instrumentality of the State and subject to its constitutional limitations.

14.     Defendant Joseph Norwood ("Warden Norwood" or "Defendant Norwood") a CoreCivic employee, was the Warden of Davis Correctional Facility acting under color of state law at all relevant times hereto. Upon information and belief, Warden Norwood resides in Hughes County, Oklahoma and is sued in his individual capacity, based on his supervisory role at DCF.

15.     Upon information and belief to be confirmed through discovery, Defendant Connor Whitlock ("Whitlock") is, and was at all times relevant hereto, a resident of Hughes County, Oklahoma. At all times relevant hereto, Whitlock was employed by CoreCivic as a correctional officer at DCF. At all pertinent times, Whitlock was acting within the scope of his employment and under color of state law.

16.     Upon information and belief to be confirmed through discovery, Defendant Robert Choate ("Choate") is, and was at all times relevant hereto, a resident of Hughes County, Oklahoma. At all times relevant hereto, Choate was employed by CoreCivic as an assistant shift supervisor at DCF. At all pertinent times, Choate was acting within the scope of his employment and under color of state law.

17.     Upon information and belief to be confirmed through discovery, Defendant Steven Eller ("Eller") is, and was at all times relevant hereto, a resident of Hughes County, Oklahoma. At

all times relevant hereto, Eller was employed by CoreCivic as a shift supervisor at DCF. At all

pertinent times, Eller was acting within the scope of his employment and under color of state law.

### FACTUAL ALLEGATIONS

18. Paragraphs 1 through 17 are incorporated herein by reference.

**A. DUSTIN'S TRAGIC AND UNNECESSARY DEATH**

19.     In February 2020, Dustin was sentenced to eight (8) years in the custody of DOC

for a violation of his court-mandated probation. Dustin was later transferred to DCF to serve his

sentence.

20.     In September of 2022, CoreCivic assigned Dustin to cell 103 in the Echo-Unit

Charlie Quad of DCF, with fellow inmate Darren Padron. The Echo Unit exclusively housed

maximum security inmates.

21.     Prior to being assigned to Cell 103 with Dustin, Padron had an extensive, dangerous

and well-documented criminal history, both in and out of prison.

22.     By way of example, Padron was involved in the 2012 stabbing death of Sonny

Limpy, an inmate at the Lawton Correctional Facility.  According to testimony from another

inmate, Padron was tasked "to execute Limpy by using hidden shanks to stab him in his major

organs under a stairwell", out of view of the security cameras at the Prison.[3] The plan did not go

as intended and Limpy was able to break away from Padron and the other inmates before he could

be killed. As Limpy attempted to get the attention of prison staff another inmate retrieved a

homemade shank and stabbed Limpy multiple times. After Limpy was stabbed, Padron can be

---

[3]     *See*, Malinda Rust, *Inmates Tell of Conspiracy to Kill Man*, Lawton Constitution,
https://www.swoknews.com/inmates-tell-of-conspiracy-to-kill-man/article_b9e9234f-72a3-5f67-8d1f-ce8afd04cb08.html.

seen on video hitting, kicking and punching Limpy until prison officials intervened. Padron later pled guilty to aggravated assault and battery in connection with his role in Limpy's death.[4]

23.    At approximately 2:14 A.M. on September 2, 2022, Correctional Officer Connor Whitlock ("Officer Whitlock"), was making his 2:00 A.M. rounds when he observed Padron with Dustin in a headlock in their cell, as Dustin was pleading with Padron to let him go.

24.    Whitlock directed Padron to let go of Dustin, but Padron ignored Whitlock and continued to hold Dustin by his neck. When it became clear that Padron would not let go, Whitlock called over his radio, requesting that the emergency response team respond to the cell.

25.    As he waited for the emergency response team to get to the cell, an inmate in a nearby cell yelled, "Spray him Whitlock, he is not going to stop." In response, Whitlock deployed a burst of Oleoresin Capsicum[5] ("OC Spray") via the food port,[6] hoping that Padron would release Dustin. The OC spray had no effect on Padron.

26.    The response team arrived shortly thereafter, which consisted of correctional officer Ajay Blocker, correctional officer Joseph Wimberly, correctional officer Richard Glemawu, correctional officer Steven Vassort, correctional officer Matthew Hewitt, and correctional officer Paul Hash.

---

[4]    *See*, *Inmate Pleads Guilty in Attack at Lawton Prison*, AP, https://www.kswo.com/story/22876691/inmate-pleads-guilty-in-attack-at-lawton-prison/.

[5]    Oleoresin Capsicum is more commonly known as "pepper spray."

[6]    A "food port is the rectangular opening in a cell door that Prison staff can utilize to pass food, apply handcuffs, or communicate with inmates. *See*, Gordon Graham, *The Dangers of the Food Port in Corrections*, Lexipol, https://www.lexipol.com/resources/todays-tips/the-dangers-of-food-port-in-corrections/.

27.     Upon arriving at the cell, correctional officer Ajay Blocker ("Officer Blocker") gave Padron loud verbal directives to release Dustin and submit to hand restraints. Padron refused, and Officer Blocker deployed OC Spray through the food port.

28.     The OC spray did not work, and Padron continued to hold Dustin in a headlock.

29.     At approximately 2:18 a.m., senior correctional officer Ricky McGehee ("Officer McGehee") arrived on the scene and gave multiple loud demands that Padron release Dustin and submit to hand restraints. Padron, again, did not comply.

30.     At approximately 2:23 a.m., assistant shift supervisor Robert Choate ("Supervisor Choate") responded to the cell and gave multiple loud demands that Padron release Dustin and submit to hand restraints. And similar to Officer Whitlock, Officer Blocker, and Officer McGehee, Padron did not comply, which prompted Choate to deploy additional OC Spray through the food port. And just as before, the OC spray was not effective.

31.     Supervisor Choate then decided to use a pepperball gun on Padron. Choate deployed 15 pepperball rounds into the cell via the food port, while other officers continued pleading with Padron to release Dustin.

32.     When the pepperballs did not work, Supervisor Choate deployed additional OC spray through the food port.

33.     Shift Supervisor Steven Eller ("Supervisor Eller") was alerted to the situation and activated the Special Operations Response Team ("SORT") at approximately 2:31 a.m., 17 minutes after Officer Whitlock discovered Padron assaulting Dustin.[7] At 2:32 a.m., Eller ordered emergency response team members to retrieve extraction shields.

---

[7]     The SORT team did not arrive until 3:34 a.m., six (6) minutes after Dustin was pronounced dead.

34.     Supervisor Eller arrived at the cell at 2:35 a.m. and observed Padron holding Dustin around his neck on the floor of the cell. Eller made multiple verbal demands for Padron to release Dustin, but Padron refused to let go.

35.     Supervisor Eller then deployed OC spray into the cell, which was predictably unsuccessful. Eller then deployed an additional 15 pepperball rounds into the cell through the food port, which also had no effect on Padron.

36.     Shortly after shooting the pepperballs into the cell, Supervisor Eller observed Padron mount Dustin so that he was sitting on Dustin's chest. Padron then placed his hands around Dustin's neck and began strangling Dustin to death.

37.     In response, Supervisor Eller shot additional rounds of OC spray into the food port while demanding that Padron stop strangling Dustin.

38.     Just as he had done repeatedly over the previous forty-five minutes, Padron ignored the commands of Prison staff and continued to strangle Dustin until Dustin was unresponsive on the floor of the cell.

39.     Padron then calmly stood up, went to the sink that was in the cell, and began to wash his hands.

40.     At approximately 3:00 a.m., after Dustin's body had gone limp and Padron was no longer strangling him, Supervisor Eller finally decided to enter the cell.

41.     When the officers entered the cell, Padron willingly submitted to hand restraints.

42.     Officer Whitlock entered the cell and began doing chest compressions on Dustin. Whitlock then attempted to use an AED device to resuscitate Dustin, but the pads on the AED device were unable to stick to Dustin's body due to the amount of OC spray that was on his body.

43.     Officer Whitlock estimated that the officers deployed approximately 10-15 cans of OC Spray during the encounter.

44.     Despite Dustin's obviously critical status, DCF staff did not call for emergency medical personnel ("EMS") until 3:06 a.m.

45.     At approximately 3:10 a.m. Dustin was placed onto a backboard and transferred to the medical unit at the Prison.

46.     EMS arrived at the Prison at approximately 3:20 a.m. and pronounced Dustin deceased at 3:28 a.m.

47.     The Oklahoma Medical Examiner conducted an autopsy on September 3, 2022, and determined Darren's cause of death was "strangulation."

48.     Despite observing Padron, who was unarmed, deploy a host of strangulation techniques on Dustin for ***over forty-five minutes***, DCF staff did not enter the cell or intervene in the assault until Padron had strangled Dustin to death.

49.     According to Officer Whitlock, Dustin was begging for his life throughout the encounter.

50.     Padron was charged with first-degree murder on September 8, 2022. *See* Hughes County District Court Case No. CF-2022-00054.

## B. HISTORY OF VIOLENCE AT CORECIVIC'S OKLAHOMA FACILITIES

51.     DCF was a 1600-bed, medium/maximum security prison for men, located at 6888 E. 133rd Holdenville, Oklahoma 74848, with 360 maximum security beds and 1,320 medium security beds.[8] Pursuant to the contract between CoreCivic and the DOC, CoreCivic was paid $55

---

[8]     In 2022, DCF was the fifth largest facility operated by CoreCivic. *See*, PREA Annual Report 2022.

per day for medium-security prisoners and $68 per day for prisoners in maximum-security and behavior-modification units.

52.    CoreCivic was founded in 1983 and is the nation's largest private corrections company. CoreCivic houses tens of thousands of inmates in its more than 60 facilities nationwide, which generated $1.85 billion in revenue and $122.3 million in net profit in 2022.[9]

53.    Up until 2016, CoreCivic was known as Corrections Corporation of America ("CCA"). It has been widely reported that CoreCivic changed its name in an effort to combat mounting criticism for its woefully inadequate prisons that led to deplorable conditions for its inmates.[10]

54.    While prisons are inherently dangerous places, CoreCivic has maintained a culture of indifference that allows violence to flourish within its facilities. Examples of CoreCivic's institutional failures can be seen through its operation of prisons in Oklahoma.

55.    CoreCivic formerly operated additional prisons in Oklahoma, including Cimarron Correctional Facility ("Cimarron") in Cushing, OK, Diamondback Correctional Facility ("Diamondback") in Watonga, OK and North Fork Correctional Facility ("North Fork") in Sayre, OK.

---

[9]    *See, News Release*, CoreCivic,  https://ir.corecivic.com/news-releases/news-release-details/corecivic-reports-fourth-quarter-and-full-year-2022-financial.

[10]    *See*, Becca Andrews, *Private Prison Company Frees Itself From Its Old Corporate Identity*, https://www.motherjones.com/politics/2016/10/corrections-corporation-america-private-prison-rebranding/.

56.    Diamondback, which was constructed in 1998, closed in 2010 after losing a federal contract to house prisoners.[11] Diamondback was plagued with myriad issues related to inadequate supervision of prisoners and multiple dangerous inmate riots.[12]

57.    North Fork, also constructed in 1998, closed in 2015 after experiencing similar problems, including a riot in 2011 that resulted in 46 inmates being injured.[13] Shortly after the 2011 riot, the state of California ended its contract with North Fork, which severely affected the profitability of the prison.

58.    Cimarron was the site of numerous incidents as well, and only closed in July 2020 due to State budget cuts caused by the COVID-19 pandemic. For instance, in September 2015, members of the Irish Mob engaged in a deadly brawl with members of the Universal Aryan Brotherhood, which left four inmates dead and several others injured. There was only one prison guard assigned to the unit at the time, and he had only been employed by Cimarron/CCA for eight months at the time. The guard, Terrance Lockett, admittedly had no idea how to react when the fight started. He later radioed for help, but misidentified his location. Lockett escorted a terrified inmate back to his cell after nurses arrived, but instead of locking the inmate back in his cell, Lockett inexplicably pepper-sprayed the scared and compliant inmate. Prison guards eventually

---

[11]    *See*, John Estus, *Prison Shuts Down in Watonga*, https://www.oklahoman.com/story/news/politics/2010/05/28/prison-shuts-down-in-watonga/61242323007/.

[12]    *See*, Matthew Brady, *Report Says Riot Lasted for Hours*, https://www.oklahoman.com/story/news/2004/07/08/report-says-riot-lasted-for-hours/61982912007/.

[13]    *See*, *46 Inmates Injured in Oklahoma Prison Riot*, CNN, https://www.cnn.com/2011/10/12/justice/oklahoma-prison-riot/index.html.

quelled the chaotic riot, but not before it would become the deadliest prison riot in Oklahoma history.

59.    Then, in March 2016, a group of Cimarron inmates threw another inmate off of the pod balcony. The chilling scene was captured on video by another inmate who possessed a contraband cell phone.[14] In May 2017, there was another serious altercation between prison guards and inmates that resulted in several inmate injuries and four guards being sent to the hospital.[15]

60.    DCF has its own dangerous and recent history.

61.    In August 2014, inmate Lewis Hamilton was stabbed to death at Davis in an assault involving four other prisoners.[16]

62.    In October 2014, inmate Joshua Wheeler strangled his cellmate, 22-year-old inmate Tony Czernecki, to death in their cell.  Wheeler had been convicted of first-degree rape in 2012 in connection with an incident in which he choked a 19-year-old woman for refusing his sexual advance, and subsequently forced her into having intercourse with him in a car. Prison guards saw Wheeler strangling Czernecki with an extension cord, but did not enter the cell until approximately

---

[14]    *See, Oklahoma Inmate Records Cell Phone Video of Man Tossed Over Balcony*, News 9, https://www.news9.com/story/5e34b534527dcf49dad8e93b/oklahoma-inmate-records-cell-phone-video-of-man-tossed-over-balcony.

[15]    *See, Brawl Involving Inmates, Guards at Cimarron Prison Under Investigation*, News 9, https://www.newson6.com/story/5e349ed8527dcf49dad83fcb/brawl-involving-inmates-guards-at-cimarron-prison-under-investigation.

[16]    *See*, Sean Murphy, *Private Company owns Oklahoma Prison Where 4 Inmates Killed*, Associated Press, https://www.seattletimes.com/nation-world/weekend-clash-at-oklahoma-prison-leaves-4-dead-4-hurt/.

11 minutes later, allegedly because the cell door key didn't work. Czernecki was dead by the time the guards entered the cell.[17]

63.    Just two months later, in December 2014, Douglas Monroe Cecil strangled his cellmate, Eric Grimm, to death in their cell.[18] At the time, Cecil was facing another first-degree murder charge for allegedly stabbing an inmate death in 2005 at the Oklahoma State Reformatory. Cecil, who ultimately pleaded guilty to murdering Grimm, allegedly had told guards at Davis not to put Grimm in Cecil's cell shortly before the murder. Upon information and belief, DCF guards failed to conduct and log their required site checks on Grimm and Cecil's cell in the hours leading up to the murder.

64.    On April 11, 2015, maximum security inmate Bryan Blackburn was bludgeoned to death by his cellmate with a plastic food tray, while in in his cell.[19] Upon information and belief, Blackburn's cellmate assaulted him over a period of 15-20 minutes and that the assault was very loud. Upon information and belief, other inmates attempted to get a Prison guard to respond to the assault, but the guard ignored them for over 15 minutes before deciding to investigate, but by that time, it was too late for Blackburn.

65.    On August 19, 2015, an inmate in the maximum-security unit at DCF was discovered hanging from the ceiling of his cell by a sheet. The inmate later died from his injuries. After an investigation, "it was determined that [the officer assigned to the Echo unit] failed to

---

[17]    *See, State v. Price,* CF-2014-216, Hughes County District Court; Parker Perry, *Trio of Homicides at Holdenville Prison,* https://www.mcalesternews.com/news/trio-of-homicides-at-holdenville-prison/article_40f5699a-42bf-11e5-8041-97193b89c481.html.

[18]    *See,* Parker, *supra* note 17.

[19]    *See, Holdenville Prisoner Faces Murder Charge in Cellmate's Death*, The Oklahoman, https://www.oklahoman.com/story/news/crime/2015/08/08/holdenville-prisoner-faces-murder-charge-in-cellmates-death/60730846007/.

conduct through security checks and was not in his assigned housing unit for nearly one hour." The officer who failed to conduct the required security checks was given a "Problem Solving Notice" but was not otherwise punished.

66.    Another DCF inmate, Rico Thomas, was murdered by his cellmate, Brian LeShore, in the early morning hours of July 20, 2017. Mr. Thomas was not discovered by CoreCivic guards until several hours after this death due to the guards failing to conduct regular site checks.[20] Mr. Thomas was a particularly vulnerable inmate due to suffering from severe mental health issues, including schizophrenia, that went completely untreated at DCF. Mr. Thomas had been assaulted by cellmates in the months before he was murdered. Yet DCF still placed Mr. Thomas in a cell with the violent LeShore, who killed Mr. Thomas shortly after the two were housed together.

67.    On December 17, 2020, an inmate was killed by another inmate in the Echo Charlie Maximum Security Housing Unit.

68.    On June 24, 2019, at approximately 8:56 a.m., DCF inmate Rossco E. Craig, was found unresponsive in his bunk with a bloody sheet over his body, during a security check. It was later determined that Craig was bludgeoned to death by his cellmate, Trevohn Price.[21] In the three (3) years prior to the murder, Price had been disciplined over 30 times by Prison staff, including five (5) instances of "assaultive behavior."

69.    Rossco Craig was a 22-year-old inmate at DCF with documented intellectual disabilities and mental illness. Prior to his June 24, 2019 death, Craig had been assaulted by his

---

[20]    *See*, *Simmons as Special Administratrix of the Estate of Rico Thomas v. Corecivic et al.,* 19-CV-234-SPS, United States District Court, Eastern District of Oklahoma.

[21]    *See*, *Craig as Personal Administrator of the Estate of Rossco Craig v. Corecivic* et al., 21-CV-183-SPS, United States District Court, Eastern District of Oklahoma.; *State v. Price*, Hughes County District Court Case No. CF-2019-122.

cell mate on numerous occasions and had notified Prison staff that he was afraid for his life. Despite that history, DCF housed Craig with Price, which predictably lead to Price beating Craig to death.

70.    On February 7, 2022, a DCF employee placed transgender inmate, Tyrese Drew, in a fenced "cage" during her unit's "rec" time. Drew was left in the cage, unsupervised, for over an hour. During that time, two (2) inmates used garden shears to cut the wires at the top of the enclosure and enter the cage with Drew. Drew yelled for help, as the inmates attempted to enter the cage, but no DCF staff responded to her pleas. Once inside the cage, the two (2) inmates proceeded to beat Drew until she was unconscious. Against all odds, Drew survived the injuries but is now unable to bathe, eat, or use the bathroom without the assistance of another person.[22]

71.    On March 24, 2022, Defendant Robert Choate observed a 29-year-old DCF inmate bleeding profusely from his neck. Choate called for an emergency response team, but the inmate was pronounced dead approximately twenty minutes after Choate's initial call. It was later discovered that the inmate had been stabbed in the neck by another inmate.

72.    Two months later, on May 31, 2022, another DCF inmate was fatally stabbed in the abdomen. The inmate was stabbed at approximately 8:30 P.M., but DCF staff was not aware of the stabbing until 8:40 P.M., when an individual from outside the facility called the Prison to report that there had been an assault.

---

[22]    *See*, *Tyrese Drew* v. Corecivic *et al.*, 23-CV-286-JAR, United States District Court, Eastern District of Oklahoma.; *State v. Price*, Hughes County District Court Case No. CF-2019-122.

73.    On July 31, 2022, correctional officer Alan Hershberger was fatally stabbed by DCF inmate Gregory Thompson. Thompson was serving a life sentence for first degree murder and had separately pled guilty to killing another inmate in 2013.[23]

74.    A September 2022 story published by the Oklahoma Watch, indicated that 18 people had been stabbed in the first nine (9) months of 2022.[24]

75.    On February 25, 2023, Brantley Avallone was found in his cell unresponsive and covered in blood.[25]  It was later determined that Avallone had been stabbed repeatedly by his cellmate, Daniel Wilson. Upon information and belief to be confirmed through discovery, Wilson had openly threatened Avallone on numerous occasions and had requested that he be moved to another cell. Avallone's requests were ignored and he was ultimately killed by Wilson.

## C. CORECIVIC'S CULTURE OF INDIFFERENCE TO INMATE SAFETY

76.    While prisons are inherently dangerous places, CoreCivic has maintained a culture of indifference that has allowed violence to flourish within DCF. CoreCivic has repeatedly inadequately staffed its facilities, inadequately trained the employees it does staff, failed to properly document serious incidents, and failed to make any efforts to rectify the sub-par conditions that lead to routine violent acts within DCF.

---

[23]    *See*, Jacob Factor, *Inmate Who Allegedly Killed a Corrections Officer on Sunday Pled Guilty to Killing Fellow Inmate in 2013*, Tulsa World, https://tulsaworld.com/news/local/crime-and-courts/inmate-who-allegedly-killed-a-corrections-officer-on-sunday-pled-guilty-to-killing-a-fellow/article_ca5e2558-11e5-11ed-bebf-930275bf3374.html

[24]    *See*, Huffman, *supra* note 1.

[25]    *See*, *Inmate Dead Wilson Arrested for Murder at Davis Correctional Facility*, https://www.holdenvillenews.com/news/inmate-dead-wilson-arrested-murder-davis-correctional-facility.

77.     For years, many CoreCivic facilities, including DCF, have consistently maintained severe staffing shortages that makes it impossible to run a safe and secure prison. When facilities, like DCF, are understaffed with by untrained guards, it leads to increased risks to vulnerable inmates like Dustin.[26]

78.     To maintain its profit margin—and due to its chronic and profit-motivated deliberate indifference to inmate health and safety—CoreCivic serially underinvests in prison staff, security, and inmate healthcare at its prisons, leading to predictable and horrific results.

79.     In 2022 alone, CoreCivic's CEO, Damon Hininger, made approximately $5,159,741.00 in wages, stock options, and other benefits.[27]

80.     Despite paying millions to its executives, CoreCivic was unable to find the resources in its budget to pay DCF detention officers an hourly rate commiserate to what DOC paid.[28]

81.     As a result of the lack of resources devoted to staffing its facilities, DCF was routinely severely understaffed.

---

[26]     *See, e.g.,* Allison Kite, *For-profit Kansas prison an understaffed 'hell hole' of violence, death and drugs*, KANSAS REFLECTOR (Oct. 7, 2021), https://kansasreflector.com/2021/10/07/for-profit-kansas-prison-an-understaffed-hell-hole-of-violence-death-and-drugs/; Travis Loller and Jonathan Mattise, *Audit Finds Tennessee Prisons Severley Understaffed, Officers Worried about Safety*, AP, https://apnews.com/article/tennessee-prison-corecivic-audit-c6fd6dbd3a60efafe57d5b57457edbaf.

[27]     In fact, CoreCivic paid their five (5) Named Executive Officers ("NEO") a total of $13,665,356.00 during the 2022 fiscal year. *See*, *CoreCivic 2023 Proxy Statement*, https://materials.proxyvote.com/Approved/21871N/20230315/NPS_530524/INDEX.HTML?page=1.

[28]     *See*, Ashlynd Huffman, *Another Officer is Stabbed as Oklahoma Prisons Struggle with Staffing*, The Frontier, https://www.readfrontier.org/stories/another-officer-is-stabbed-as-oklahoma-prisons-struggle-with-staffing/.

82.    By way of example, the Annual Operation Audit of DCF, completed on November 4, 2021, noted that DCF "has not maintained the approved staffing pattern during the audit period. The staffing level at the time of the audit was 71%."

83.    The lack of staff resulted in inmates being inadequately supervised. According to former Davis correctional officer, Jamie Sasnett, "he often guarded 120 prisoners by himself and up to 240 on occasion."[29]

84.    The lack of staff also caused the prison to go on lockdown constantly. For instance, in a report from September 2, 2022 (the same day that Dustin was killed), a DOC employee noted that "DCF is still having periods of lockdown due to officer/staff shortages."

85.    In the Oklahoma Watch's September 2022 story, Bobby Cleveland, the executive director of Oklahoma Corrections Professionals stated that DCF was "locking down constantly because they don't have enough staff." Former Davis correctional officer Jamie Sasnett was also interviewed for the story and noted that "staffing shortages regularly kept prisoners in their cells during his three years on the job."[30]

86.    CoreCivic and Defendant Norwood were clearly on notice that their practice of understaffing DCF, and other CoreCivic facilities, substantially increases the risks of inmate-on-inmate violence, as evidenced by the inmate deaths identified above. *See, e.g.*, ¶¶ 54-75, *supra*.

87.    Further, CoreCivic has utterly failed to properly train and supervise the staff at its detention facilities, including DCF. CoreCivic facilities, including DCF, have a policy, practice,

---

[29]    *Id*.

[30]    The lack of qualified staff at DCF was further exacerbated by the July 2022 death of correctional officer Alan Hershberger. For instance, in an August 12, 2022 DOC report, following Hershberger's death it was noted that "[s]taff is very concerned for their safety and new hired staff has declined employment after the death of a staff member."

and/or custom of failing to train and supervise their prison employees in the following areas: conducting regular sight checks, reporting violent incidents between inmates, documenting physical altercations between inmates, taking inmate complaints seriously, preventing inmates from obtaining contraband such as illegal narcotics and makeshift weapons, properly classifying and housing inmates, providing adequate medical and mental healthcare treatment to inmates, and reporting policy violations to superiors.

88.    To make matters worse, and likely due to the lack of staff at the Prison, DCF staff was not supervising inmates as required by CoreCivic and DOC policies. DOC policy requires that "[f]acidity counts will be conducted at hourly between 2200 and 0400." *See* OP-04101. The 2021 DOC Audit of DCF noted however that the facility was "not conducting hourly counts between 2200 and 0400." According to the Audit, DCF was only "counting at 2200, 0000, 0200, and 0400."

89.    The failure to conduct hourly counts between 10:00 P.M. and 4:00 A.M. is notable here because Officer Whitlock did not discover Padron strangling Dustin until 2:14 A.M., during his 2:00 A.M. count. Had Whitlock and other DCF staff conducted hourly counts of Dustin's cell, Padron would not have been given unfettered, unsupervised access to assault Dustin.

90.    CoreCivic and Defendant Norwood were clearly on notice that their practice of failing to train their employees in how to supervise and protect inmates, substantially increases the risk of violence among inmates. However, CoreCivic and Defendant Norwood failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Dustin

## CAUSES OF ACTION

### COUNT I. CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT
### (42 U.S.C. § 1983)
### (*AS TO DEFENDANTS WHITLOCK, MCGEHEE, ELLER, AND CHOATE*)

91.    Paragraphs 1 through 90 are incorporated herein by reference.

92.     At the time of the complained events, Dustin, as an inmate already convicted of a crime, had a clearly established constitutional right under the Eighth Amendment to be free from cruel and unusual punishment.

93.     The Eighth Amendment requires that convicted inmates, like Dustin, be offered reasonably adequate conditions of confinement. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the Eighth Amendment.

94.     CoreCivic employees, including Defendants Whitlock, Eller, and Choate knew, or it was obvious that maximum security inmates, like Dustin, were subject to a substantial risk of violent injury if not monitored closely, as required by DOC and CoreCivic policy.

95.     CoreCivic employees, including Defendants Whitlock, Eller, and Choate, failed to regularly monitor the unit Dustin was housed in on September 2, 2022 and therefore enhanced and/or created the danger and put Dustin at substantial risk of serious, immediate, and proximate harm.

96.     The Defendants further deprived Dustin of his right to be free from cruel and unusual conditions of confinement when they failed and/or refused to intervene in Padron's assault of Dustin, despite having the duty and opportunity to do so.[31]

---

[31]     "This Court has held that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Hooks v. Atoki*, No. CIV-17-658-M, 2018 WL 11266784, at *3 (W.D. Okla. June 22, 2018), report and recommendation adopted, No. CIV-17-658-M, 2018 WL 11266755 (W.D. Okla. July 16, 2018) (citing *Evans v. Cameron*, 442 F. App'x 704, 707 (3rd Cir. 2011)).

97.    Defendants Whitlock, Eller, and Choate watched Padron strangle Dustin for over forty-five minutes prior to Dustin's death. These Defendants had a reasonable opportunity to intervene to protect Dustin, but failed to do so.

98.    Knowing that Dustin was at substantial risk of serious harm, Prison staff, including the Defendants, deliberately ignored the substantial risk to Dustin's safety, and sat by while Padron choked Dustin to death.

99.    A reasonable correctional officer or prison official, who observed on inmate strangling another inmate would have taken some action to prevent or reduce injury to the victim.[32]

100.    Defendants knowingly, intentionally, willfully, and maliciously disregarded the obvious risks of bodily injury and death to Dustin, failed to provide humane conditions of detention, deprived Dustin of life's necessities and life itself, and violated Dustin's Eighth Amendment right to due process, resulting in substantial harm and death to Dustin.

101.    As a direct proximate result of the Defendants unlawful acts and/or omissions Dustin suffered physical pain, severe emotional distress, mental anguish, terror, and ultimately death.

102.    Plaintiff is entitled to punitive damages on his claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and omissions alleged herein constitute reckless or callous indifferences to Dustin's federally protected rights.

---

[32]    "The law is well established that failure to intervene in an inmate assault may sustain an Eighth Amendment failure to protect claim." *Hooks v. Bethany Police Dep't*, No. CIV-17-658-M, 2018 WL 11266782, at *6 (W.D. Okla. Mar. 19, 2018), report and recommendation adopted, No. CIV-17-658-M, 2018 WL 11266754 (W.D. Okla. Apr. 16, 2018).

### CLAIM II. MUNICIPAL/"MONELL" LIABILITY
### (42 U.S.C. § 1983)
### (*AS TO DEFENDANT CORECIVIC*)

103.    Paragraphs 1 through 102 are incorporated herein by reference.

104.    CoreCivic is a "person" for purposes of 42 U.S.C. § 1983.[33]

105.    At all times pertinent hereto, CoreCivic was acting under color of state law.

106.    CoreCivic has been endowed by the Oklahoma Department of Corrections with powers or functions governmental in nature, such that CoreCivic became an instrumentality of the State and subject to its constitutional limitations.

107.    CoreCivic is charged with implementing and developing the policies of the DOC and the Oklahoma Jail Standards with respect to the care and supervision of inmates in the custody of the DOC who are housed at DCF, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees.

108.    In addition, CoreCivic implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Prison.

109.    Defendant CoreCivic has an unconstitutional policy or practice of maintaining chronically inadequate staffing levels at DCF, which leaves inmates, like Dustin, exposed to serious risks of violence. CoreCivic also has an established practice of undertraining and/or inadequately training the staff that it does employ.

110.    CoreCivic's inadequate staffing and training policies have resulted in DCF staff that fails to properly monitor DCF inmates, respond to inmate-on-inmate violence, properly

---

[33]    "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits has extended the *Monell* doctrine to private § 1983 defendants." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted).

classify and house inmates, and seek emergent medical treatment for inmates in obvious need.

111.    Additionally, CoreCivic has an established practice or custom of failing to report, investigate, and address, policy violations committed by DCF staff members. As a result, CoreCivic has tacitly condoned, acquiesced in, or encouraged conduct of DCF employees which violates the constitutional rights of inmates like Dustin.

112.    As a result of the numerous incidents identified *supra*, CoreCivic had actual knowledge of DCF's chronic understaffing and undertraining problems, but opted not to staff or train DCF adequately because doing so would have been less profitable.

113.    Moreover, CoreCivic knew or should have known, either through actual or constructive knowledge or it was obvious, that the aforementioned policies, practices and/or customs posed substantial risks to the health and safety of inmates like Dustin.

114.    By fostering the aforementioned policies, practices and/or customs, CoreCivic has created an environment in which inmates like Dustin are exposed to an increased risk of violence. Nevertheless, CoreCivic failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Dustin's, rights to be from inmate-on-inmate violence.

115.    Furthermore, there is an affirmative causal link between the aforementioned acts and/or omissions of DCF staff, including Defendants Whitlock, Eller, and Choate, in being deliberately indifferent to Dustin's right to adequate protection while in confinement, and the above-described customs, policies and/or practices carried out by CoreCivic.

116.    As a direct and proximate result of CoreCivic's policies, practices and/or customs, as described above, Dustin experienced unnecessary physical pain, emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of his life.

117.    Plaintiff is entitled to punitive damages on his claims brought pursuant to 42 U.S.C. § 1983 as CoreCivic's conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Dustin's federally protected rights.

### Count III. Supervisory Liability
### (42 U.S.C. § 1983)
### (AS TO DEFENDANT NORWOOD)

118.    Paragraphs 1 through 117 are incorporated herein by reference.

119.    There is an affirmative causal link between the aforementioned acts and/or omissions of DCF staff in failing to protect and/or intervene as Dustin was brutally murdered, and the above-described customs, policies, and/or practices that were adopted, promulgated and implemented by Defendant Norwood. *See, e.g.*, ¶¶ 76-90, *supra*.

120.    At the time of Dustin's murder, Defendant Norwood knew and/or it was obvious that DCF's chronic understaffing and undertraining resulted in an extraordinary and outsized level of inmate-on-inmate violence at the facility.

121.    Defendant Norwood was repeatedly made aware of these constitutionally infirm and dangerous conditions at DCF, but consistently failed to take action to remedy those conditions.

122.    Warden Norwood, through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Dustin's, constitutional rights.

123.    There is an affirmative link between the unconstitutional acts of his subordinates and Warden Norwood's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

124.    As a direct and proximate result of the policies, practices and/or customs that were adopted and/or implemented by Defendant Norwood, Dustin experienced unnecessary physical pain, emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of his life

125.    Plaintiff is entitled to punitive damages on his claims brought pursuant to 42 U.S.C. § 1983 as Defendant Norwood's conduct, acts and/or omissions, as alleged herein, constitute reckless or callous indifferences to Dustin's federally protected rights.

### CLAIM IV. VIOLATION OF THE OKLAHOMA CONSTITUTION
### (OKLA. CONST. ART. 2, SEC. 7)
### (AS TO DEFENDANT CORECIVIC)

126.    Paragraphs 1 through 125 are incorporated herein by reference.

127.    Dustin had a clearly established right to bodily integrity to be free from inmate-on-inmate violence under Art. 2, §§ 7 & 30 of the Oklahoma Constitution.

128.    CoreCivic, through its employees and officials, deprived Dustin of that right by failing to properly classify and house Dustin, failing to regularly monitor Dustin, and failing to intervene to protect Dustin from Padron.

129.    Additionally, there is an affirmative causal link between the aforementioned acts and/or omissions of DCF staff, and policies, practices and/or customs that were adopted, promulgated and implemented by CoreCivic.

130.    CoreCivic knew or should have known, either through actual or constructive knowledge or it was obvious, that the aforementioned policies, practices and/or customs posed substantial risks to the health and safety of inmates like Dustin

131.    By the aforementioned acts and omissions, CoreCivic deprived Dustin of his right to be free from cruel and unusual conditions of confinement.

132.    The acts or omissions of CoreCivic, and its employees, violated Dustin's due process rights and are actionable through *Bosh v. Cherokee County Building Authority*, 2013 OK 9, 305 P.3d 994.

133.    As a direct proximate result of the unlawful acts and/or omissions, described herein, Dustin experienced unnecessary physical pain, emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of his life.

134.    Plaintiff is entitled to punitive damages as Defendants' conduct, acts and/or omissions, as alleged herein, constitute reckless or callous indifferences to Dustin's federally protected rights

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted by:

SMOLEN LAW, PLLC


/s/ *John W. Warren*
Donald E. Smolen, II, OBA #19944
John W. Warren, OBA #33635
611 S. Detroit Avenue
Tulsa, OK 74120
(918) 777-4529 Telephone
(918) 890-4529 Facsimile
don@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*